The first case today is 20-1027 Mayotte v. U.S. Bank. Counsel for the appellant, would you make your appearance and proceed please. Good morning, thank you, your honor. May it please the court, my name is Brad Klaver. I represent the appellant Mary Mayotte. Your honor, I don't typically start an argument by telling the court what my case is not, but I know that this court has seen a lot of this type of litigation over the years, and I want to be very clear at the outset that this is not a case of a disgruntled homeowner who is shouting, show me the note, who thinks that somehow, some way, the constitution must entitle her to a free house. This is not that case, and this is not a case for my client is asking the court to give her a free house. Mary Mayotte simply wants her day in court, and this court can give her that without writing any new law. Now, the Tenth Circuit has already reversed and remanded this case once to give my client that opportunity, and given the numerous unresolved questions of disputed fact in this case, the court should do so again. Now, we'll get into the disputed facts, but what is undisputed in this case ought to concern this court very deeply. It is undisputed that for many years of litigation in this case, U.S. Bank and Wells State and federal banks, federal courts, excuse me, that no document existed to sustain my client's claims in this case, when in reality, that document did exist and was concealed in their possession all along. It is undisputed that by falsely denying the existence of that document, they have successfully misled those same courts into barring my client's claims under the credit agreement stashed for frauds, and it is undisputed that U.S. Bank admitted under oath to never having even reviewed my client's case before or even after filing multiple cases in its own name to have her evicted from her home. So, these facts are very troubling, and they explain why this case is still going on after all these years. But despite these undisputed facts, the district court took it on itself to resolve three disputed questions of fact, and it did so by either misapplying or not acknowledging significant evidence in the file, and those three errors of fact gave rise to two legal errors, namely, misapplication of credit agreement statute of frauds and misapplication of the economic loss rule. So, I want to talk a little bit about the facts that the court got wrong. As I mentioned, there are three of those. The first pertains... Can I ask you, and I don't want to get you off track, but one of the issues that Judge Jackson addressed was the failure to approve, present evidence of compensatory damages, and if you don't mind, I just want to ask you one question about that. Even though you have certainly alleged emotional distress and a number of non-economic damages, in the response to the summary judgment motion, is it fair to say that you did not include a declaration or affidavit about any emotional distress damages or to present any evidence that her non-economic damages would exceed what he called the rental value of the home, in other words, to be able to live in the home for 10 years without a payment? Why would that not independently require affirmance, even if we agree with you on the economic loss rule of the statute of frauds? Yeah, that's a great question. You're right in acknowledging that the court's order does this balancing between whether her damages exceed the benefit that she derived, which is a kind of odd way. The court acknowledges that she has pleaded these damages and then says, but I find that because she doesn't have enough damages that I will conclude that she doesn't have any damages. I would say that's a question of fact for the jury to weigh those competing the jumble of economic and non-economic damages versus this rudimentary rent calculation the court engaged in. But, you know, as the Celtec's opinion said, a litigant doesn't need to provide affidavits at the motion summary judgment stage and that the evidence presented to survive an MSJ doesn't even need to be admissible thereafter. So my point is that at the summary judgment phase, you have to come forward with some evidence. I mean, that is the suggested was there was no evidence presented as it relates to non-economic damages. Is that not the case? Well, your honor, my client testified that she was forced to declare bankruptcy to save her home. She has under butted expert testimony describing this, this pattern of operational risk and professional negligence that and holding that it caused her harm in this case. She described, I think the court can infer from the years of litigation that she's endured court fees, legal costs, the stress and anxiety, the humiliation that goes along with this. I think the record does speak to all of those types of damages that were alleged. And again, as I indicated, the sort of weighing of one versus the other, I think is more appropriately the question for the jury to determine whether those damages are insufficient to outweigh what the court described as the benefit that she derived from being in the home. And I would also point out that the state court even acknowledged that that may have conveyed a substantial benefit to the banks by keeping the property in good condition during that time. So there's a lot of evidence that just wasn't weighed in that calculation. The court just sort of determined on its own that he felt that my client wouldn't be able to So I think the evidence in the record is sufficient to sustain my client's burden in this case. So on that note, getting back to the sort of errors of fact in the case the court made with respect to different issues here, the first pertains to the meaning of the call note. The second revolves around the circumstances surrounding certain short-term forbearance agreements that were entered into by the parties. And the third is, as we've just discussed, this measure of damages. I want to briefly discuss the call note itself. Now, for the first five years of litigation, the banks fought tooth and nail to ensure that my client never had access to any discovery in this case. They fought it at every instance. And it wasn't until this court reversed and remanded that my client finally had access to her own file for the first time. And there, sure enough, in that file, you have a writing by Wells Fargo that memorializes an agreement between the parties. That occurred at a time when my client was not in default. When she called to make a payment, they refused the payment, told her to hold on to it and to use it as a down payment on her new loan. And they've always denied them. They denied it in this have never admitted to a court that they waived payment. And that is evident from the call note. Now, the court, again, sort of substituted its own opinion for that of an unrebutted expert witness in this case, which is interesting because the court denied the bank 702 motion. We found that Dr. McNulty was well qualified to speak on these matters. He's had decades of experience in this particular field, has published multiple articles on the topic. And he described this communication as egregious, as unethical, as unsafe and unsound. It's part of a pattern and practice of deceptive conduct that Wells Fargo is engaged in across the country at the time that they have admitted to. In many instances, there are multiple lawsuits across the country describing this mystery make three scheme where people say, look, they told me to miss payments and immediately foreclosed on me. The court didn't consider any of that evidence. It instead just sort of said, well, I think what this note means is that they would have considered her if she had met some other conditions, which is not really what the note means at all. So I think that is, you know, we can set aside arguments of counsel. Obviously, it's our job to disagree. But when you have an underbutted expert witness that the court has acknowledged is an expert in this field, and the court is unilaterally overruling that expert's opinion on these matters and saying there's no question of fact here, I think that's problematic. And I would be very surprised if the court has a lot of cases where they have affirmed an order on summary judgment against the party with underbutted expert testimony in those circumstances. Well, that that underbutted expert testimony in particular now focusing on your characterization of it here goes towards the nature of the alleged scheme, if you will, that was undertaken by Wells Fargo. It doesn't go to the nature of whether this particular writing is an agreement. And that is really the threshold issue that you have to overcome under the statute of fraud statute. And so it one has to the district court addressed that threshold issue and was asking whether in fact, you could say that this reflected a meeting of the minds. And I mean, when you look at it, and I have it up on my screen, it is it is a fairly skeletal thing. I think I don't think one can disagree with that. And therefore, what in it allows one to say that you had a meeting of the minds on a modification of a commercial agreement, which is exactly what it seems to me the statute of fraud is designed to avoid such skeletal documents. Yeah, so a couple things there, you know, the police rely on in their briefing on the Brush Creek, the Avalon Park case, in that says that indefiniteness in the term in a term that would otherwise render a contract unenforceable for the failure of mutual assent can be cured by subsequent performance, that the the conduct of the parties thereafter can supply those emissions. And here you have years of conduct all evidencing that this agreement was real and that the parties had agreed to it. Matt did forego payment in that instance, when she was instructed to the banks then proceeded to to mislead and cover up for this and deny it to other courts that denied it in writing to me out herself for four years thereafter. They, you know, have have admitted to exactly this type of negligence across the country and multiple consent decrees with the federal government. So there's a lot of conduct that can be used to supply that, that omission. And that that, like I said, is in keeping with Colorado law, that in these instances where like you said, it is skeletal, there is, there is, there are things that we can't quite tell from that document. Now, I would point out in the in the Fisher Supreme Court opinion, the ambiguity analysis is certainly relevant. But in the concurrence of the Supreme Court opinion, then Justice Ide rightly noted that even setting aside ambiguity issues, there is also a fraud exception to this rule. And that was described in the briefing on the on the motions for summary judgment that even if, if this is, if the court holds this is not ambiguous, there's, there's still a fraud exception that should be analyzed here. And here you have a promise from the bank that's memorialized in writing that my client took their advice on, and they immediately turned around and foreclosed on her for doing that. So there are a couple of different ways to to look at this. When you use the word ambiguous, ambiguous as it relates to an ambiguous contract. Is that what you're saying? Yes, the court has described a couple of different ways to find ambiguity. The Supreme Court said in 1989, the Colorado Supreme Court that ambiguity is is when a provision is reasonably susceptible to more than one meaning, which is pretty general. And again, we've just described how the court had a very different described a very different meaning to that than a retained expert witness. I guess the point I'm making is that and that you have in your briefing on appeal, an argument that you sketch out relative to ambiguity and and it creating a question of fact. I guess I have two questions as it relates to that. One, did you make such an ambiguity argument before the district court? I don't see any indication that you did. And two, if you have if there is anything that that even approaches that ambiguity, it would seem to me implies ambiguity as it relates to the terms of an agreement. The district court says at the threshold, there is no agreement. So there is nothing to be ambiguous about. So deal please with the first question. And the first question goes to whether you've even waived this argument at all. I think in the district court that we argued that the plain language of the note speaks for itself. Well, that's different than saying it's ambiguous, isn't it? Well, at that time, the the ambiguity analysis really hadn't been provoked by this introduction of extrinsic evidence. At that time, we were focused on the plain language of the note. The court in its order brought in this this argument of counsel saying, well, this was probably a conditional term that that applied thereafter. So our arguments at the time were appropriate to the circumstances that were under discussion at that time. Well, that's not really the way litigation generally works. You're not supposed to be in a situation where you're responding to what the district court said. I mean, if you thought the agreement was ambiguous, you should have said it was ambiguous. You didn't say that before the district court. Nor if I recall correctly, if you argue for plain error on appeal, which is our rubric to allow you to get out of this, well, not get out of, but to address the situation where you didn't raise something before the district court. So if you haven't done either one of those things, it seems to me that we don't have any in our discretion. We don't have any reason why we have to consider your ambiguity argument now. You have any laws that says I'm wrong on that? Well, the interpretation of terms is a question of law. The court can affirm on any. But you're asking us to reverse, not reform. Sure. Well, the court can rule on a question of law that is before it. I think that's cited in the statute. So I think the court does have jurisdiction to address that question now in response to the manner in which the court ruled. So I would like to briefly maintain some time for rebuttal, if I can. Sure. Good morning, your honors, and may it please the court, Andrew Jacobs, for the appellee defendant Banks. Just addressing a couple of the topics that have come up to this point, specifically on the question of damages, in their motion for summary judgment, which is appendix 1181, all they say on the subject of damages, to the point of Judge Bacharach's question, is they refer to an exhibit D at pages 15, 16. And when you follow the thread through there, what you get is just basically an indication that there was a foreclosure order. So they were very clearly not making reference to any non-economic damages below. And as far as the $310,000 of benefit to Ms. Mayotte, that's really sort of a comfort argument. It's an underneath extra layered argument. But they've not pointed to any of the species of non-economic damages, which are cited in their brief, page 12. They have the full catalog, credit injury, lost opportunity, reputational harm, emotional distress, the full panoply of those things. But none of them are sought to be evidenced in their brief in this response below at appendix 1181. So there really is not something there. The court also was not applying really a back of the envelope calculation. As counsel suggests, the $310,000 of additional value to Ms. Mayotte, counsel began by saying, you know, this isn't a free house case. And I understand these are difficult cases. I'm not trying to make light of this at all. These are important things for the people involved. You know, we get that. But Ms. Mayotte did stay in through 2019 and did derive a $300,000 benefit from staying in the house. And when you consider that there's not a quantum of damage, which is indicated by evidence, I think that's significant. And the district court properly looked at that benefit in determining that there was no issue effect concerning damage here. And the way it derived it was from a number provided by Ms. Mayotte below, which was in a response to a motion dealing with the house and a bond. She estimated that it was worth $2,500 a month as a going concern as a matter of rent. And that's a page appendix 1974. So that number was not pulled out of the air. It was a fair number. It was Ms. Mayotte's own number. And she did derive some benefit through the circumstances of this, which, you know, we understand are an important and difficult thing for the parties. We don't minimize that. So counsel, before you move on, I guess I'm going to tear that argument apart just a bit. What you just suggested. Are you saying that we actually don't need to look at the $310,000 evidence of any damage to her at all? Is that what you're saying? I mean, that the $310,000, I guess you're saying it was properly calculated, but that doesn't actually, that isn't evidence of her damage. She has to show damage initially. Is that the argument? Yeah, Your Honor, I apologize for being unclear. I'm making sort of a two layered argument here. The first layer, which is the one I think that is dispositive of the issue is the one that emerged from Judge Bacharach's question. And it precedes any consideration of $300,000. And I'm just saying that she did not preserve any argument for non-economic loss damages. She did not provide any evidence at the pages that I cited. She did not provide any evidence to this court in the pages of the brief that I cited. And then I said, separate and apart from that, which I believe already decides the issue, there's also in the absence of any demonstrated quantum of injury through non-economic harm, the first part of this, I'm saying additionally, the court properly noted that she also derived $310,000 of economic benefit from the house. So hypothetically, if my friend on the other side had pointed to $100,000 of actual loss, which is not the case, there's none, then if you were weighing it, she would still not have had a net loss. That's all I'm saying. It's a very minor point, Your Honor. Thank you. May I ask a somewhat unrelated question? How could the failure to present evidence of compensatory damages allow us to affirm the summary judgment award on the declaratory judgment claim? For a declaratory judgment, she wouldn't have had to prove compensatory damages. Well, I think that the thing that she's seeking a declaration of is, I mean, I'm a little bit confused as to the declaratory judgment claim at this point in the case, Your Honor, because all the claims that are extant are damage-oriented claims. And so she's not seeking at this point a declaration that she owns the house. So I'd have to consider what the object of the declaration is which is sought, because the extant claims that we're analyzing all have damaged tails on them as I understand it. But you're correct, Your Honor, that damage is not an element of a declaratory judgment claim per se, absolutely. Well, it seems to me that you have a legitimate point, and that is that there may be no valid declaratory judgment claim, but you did not argue that in district court. So I'm not sure how we can affirm a summary judgment award on this theory saying there's really no need to prove compensatory damages for a declaratory judgment, but there is no valid declaratory judgment claim because it doesn't fall within the declaratory judgment act. Understood, Your Honor. And I think that the remaining legal arguments dispose of all the claims. I think, for example, the fact that the special forbearance agreements of 2010 necessarily supersede any supposed agreement to modify would prevent there being any declaration in favor of Ms. Mayotte. And it goes to, by way of rebutting my friend's remarks, he indicated that Wells Fargo had this call note, which let's remember is September 2008, and then he said the bank set about immediately foreclosing. Well, there was a foreclosure, and the forbearance agreements were in 2010. So fully two calendar years later, you have Ms. Mayotte signing, and ironically, to a way that much more clearly speaks to the statute of fraud, she actually signed the writing that she would be charged with in both April of 2010 and November of 2010, saying the underlying note and deed of trust instruments remain of full force in effect. There could be a foreclosure right then as she signed, that the bank was waiving no rights, and that those things remained in effect. And so those understandings necessarily would constitute a novation and supersede any claim to contrary understanding that Ms. Mayotte would impute to the September 2008 call note. And so that- But novation only applies to a contract claim, and she's not asserting any contract claim. All of her claims are tort claims. So why would novation even be pertinent? Because in this case, she's claiming a tort that flows from an alleged right to do things, and under applicable provisions of law, she had no right to do the thing that she claims the call note conferred upon her a right to do. She no longer had any such right. She had no longer had any reasonable expectation, and you can't be in derogation of a duty to do a thing which the law plainly provides that you have no obligation to do. The call note, I mean, his entire argument about the call note is that it creates a reasonable expectation that she had an understanding as to what she was supposed to be doing. And, you know, additional to that, as far as the call note goes, I'd be remiss in failing to mention that she is resorting to her own extrinsic evidence to try to construe the call note. And Colorado law is very clear in Cheyenne Mountain School District that she can't do that. She can't use her own extrinsic expressions of intent as to what she wishes a contract would mean to construe that contract. And so the call note doesn't become ambiguous. It is, as Judge Holmes properly noted, skeletal. It has, for example, no reference in it whatsoever to modification. It doesn't say we're going to modify. It's a bootstrappy, circular, question-begging argument at best because it basically says, and both sides agree, it refers to if you delay a payment, there could later be an application of the payment. But that doesn't mean that you're going to be given a modification under which you'll later pay. And again, to the point of counsel's argument, where he contends that there was some sort of immediate negative action against Ms. Mayotte following the call note, and that somehow you're supposed to bootstrap back into the call note that there was, you know, a misleading going on, very far from it. There were the TPP processes and payments accepted in 2009. There was, in 2010, the pair of different forbearance agreements. So there was a multi-year process of giving her lower amounts to pay, a lower threshold to hit, asking her to hit that, asking her repeatedly to apply for purely discretionary modifications. So there was nothing compulsory in the call note. There was nothing contractual in the call note. There's nothing, and also the theory of the call note is internally contradictory because she'd already missed two payments. His theory is that it's a miss three, make three thing. She'd already missed two at the time of the note, which he claims confers a contractual obligation upon the bank and between those parties. So again, the record just does not support that. So the call note does not satisfy the CCAF, in addition to the fact that it's not signed. It also is insufficiently clear. It's sought to be made ambiguous when it's not ambiguous. Terms are sought to be packed into it that don't belong there, and Ms. Mayotte, too, is a sophisticated party as well, and she opined at Appendix 1966 that she is a successful business person and that she had clients of her own. And so, you know, we understand the difficulty of the situation for a homeowner. We really respect that, but that doesn't turn this into a contract when it's not. It doesn't make it clearly have terms that it does not have. Can I interrupt you for a second? I just want to make sure I understood your point about she had already made two payments. Are you saying that if they're positing that this was a mis-three, made three, or whatever the verbal accusation was on that, if they're positing that that was the nature of the contract, it couldn't be the case because she had already done something. In other words, it wasn't an agreement that you missed three payments and then you'll get a modification because she had already missed two payments at the time that this communication took place. Is that the point you're making? I just want to be clear what you're getting at there. Yes, Judge Holmes. That's pretty much precisely it, that she had missed two payments. And so, to point to a call note when you've missed two payments and say, aha, during this call, because again, it's really important in terms of the statute of frauds that the writing is supposed to be the agreement. That's the whole point of having a writing. The parties are supposed to sign it. It's supposed to have precision in terms and mutuality, right? The meeting of the minds that the judge was properly concerned about below. And so, how can that happen when you're already two of the three payments down the road to I missed, I missed? It just, it doesn't add up. It doesn't conform to what we understand to be the purpose of mutuality or it's backstopped. The statute of frauds where that mutuality is found lacking. Well, the language speaks so arguably in terms of you do one more, miss one more payment, and then certain things will happen. And so, why wouldn't, couldn't that have been the nature of the agreement as opposed to you missed three payments and you'll do this? It would be you one more payment because I'm looking at the screen showing you've already missed two. And therefore, then we'll act. Why couldn't that be the nature of the agreement? Well, I think because I think Judge Holmes, the words don't form a picture that's sufficiently clear to say that we will do this. It says, if you miss, you could apply that to a future, to a future down payment. That doesn't mean that a future down payment is then promised to be given. I just think it's insufficiently definite as our position, Judge Holmes, based upon the skeletal nature of the note, it doesn't properly specify a compulsion or a requirement. It talks about something that could potentially happen. We agree and she agrees. If you withhold it, you later could use it. In fact, Ms. Mayotte may have used it, right? She may have used it in her TPP payments. She may have used it in her forbearance agreement payments. I don't know how that water flowed down the river, but she had the opportunity later to use it in service of the call note, at least ambiguous in terms of whether it confirms Ms. Mayotte's interpretation, because the call note doesn't say that you can then apply for a loan modification. And if we grant a loan modification, you can use this September payment as a down payment. It just says, you borrow, obviously gather financials, give us a call back, wants to make a payment, advised to hold onto it and use as initial down payment. That could plausibly be interpreted to mean that you will have an initial down payment because we're telling you, hold onto it, don't pay now. You're going to get a loan modification and you can now use this as an plausible confirmation of her understanding of the oral agreement. Because a statement that if you have in the future, a down payment to make, you could use it for a down payment. It's just completely silent on the question that you will be in the situation where you will have a future down payment to make. That's that very point that your question puts the finger on and presses at Judge Bacharach is the very thing that is empty and vacant and you're going to get it. It's that it's a possible thing. And that was a general industry-wide guideline that you would be re-evaluated under HAMP and under other programs for when we were going through the Great Recession, you'd be evaluated for the chance to have voluntary extensions and voluntary help from the banks if you had missed a certain number of payments. So it wasn't an entitlement. It never was an entitlement. This is a classic, no good deed goes unpunished. It's really unfortunate that 60% of the people in HAMP could not qualify because they weren't able to have the financials to have the wherewithal to make the payments. We wouldn't want to live in a world where banks don't want to have HAMP, where banks don't want to voluntarily offer extensions. Because if we say, you might, becomes a contract, people in the next financial crisis can't offer those benefits to people voluntarily and to work cooperatively outside, sometimes outside of government or with government. And I think that that would be a very bad space for us to operate in, Your Honor. As far as economic loss doctrine goes, there are no extra contractual duties that are referred to here. And this is another waiver. They did not mention economic loss doctrine, Appendix 2367 to 68, which is where they say they preserved it in response to our motion, just as they did not provide evidence of damages and did not provide argument about innovation. And my time, unfortunately, is up. And unless Your Honors have further questions, I thank you for your time this morning. Thank you, Counsel. I think you had, like, yeah, 24 seconds. Mr. Klaver, I think you're on mute. Thank you, Your Honor. Sorry about that. I'll be as brief as I can here. Briefly, with respect to the timeline, the banks acknowledged that Mayotte made a payment on July 31st of 2008, and the call note in question is September 22nd. It's about 31 days later. So as we've alleged, she was calling to confirm the advice that they had given her prior about missing the three months. So she had just made a payment just barely a month before when she was instructed to not make another payment. So this timeline that she was, you know, already well in default by the point is not accurate. And briefly, with respect to innovations, I just want to point out... You're over time, Counsel. I'm sorry. All right. Well, then on that note, I hope this court will give my client her day in court so she can finally end these six years of argument before the court with four days of evidence before jury. Thank you, Your Honor. Thank you. Case is submitted, Counsel. Thank you for your argument.